**WISCONSIN AVENUE NURSING HOME, Petitioner,**

v.

**DISTRICT OF COLUMBIA COMMISSION ON HUMAN RIGHTS,**
Respondent.

No. 85–396.

District of Columbia Court of Appeals.

Argued May 7, 1986.
Decided May 7, 1987.

Harold O. Miller, argued, for petitioner and Roy J. Bucholtz, Reston, Va., was on the brief, for petitioner.

Edward E. Schwab, Asst. Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Before FERREN, BELSON and STEADMAN, Associate Judges.

BELSON, Associate Judge:

The Wisconsin Avenue Nursing Home (the Home) seeks review of a final order of the District of Columbia Commission on Human Rights (the Commission) which concluded that the Home unlawfully discharged two nursing assistants because they are black.[1] We agree with the Home that the Commission, in denying the Home's motion to dismiss, erred in failing to consider and rule upon the Home's contention that it was prejudiced by the long delay between the filing of complaints and the conclusion of the hearings in this case. We therefore remand the case for expedit-

---

1. Such a finding was made pursuant to District of Columbia Human Rights Law, DCRR Tit. 34 (1973), which was reenacted as the Human Rights Act of 1977 on December 13, 1977, D.C.Law 2–38, D.C.1977 D.C.Stat. 461, codified as amended at D.C.Code §§ 1–2501, *et seq.* (1981 & 1986 Supp.).

ed consideration of whether prejudice requires dismissal. To avoid further delay in a case filed over eleven years ago, we also decide the other issues raised by the Home. We find error in one of the Commission's findings of fact underlying its conclusion that the Home discriminated against complainants; however, because we have no substantial doubt that the Commission's ultimate conclusion would have been the same even if the erroneous finding had not been made, we hold that this error was not prejudicial to petitioner. In addition, we hold unsupported by substantial evidence of record the Commission's finding that complainant Wills exercised reasonable diligence in seeking alternative employment after her discharge from the Home. We therefore remand for whatever further hearing the Commission deems necessary to determine, with expedition, the amount of loss Wills would have suffered from her discriminatory termination had she diligently attempted to mitigate her damages.

### I

The Home hired the complainants Sonia Hollingsworth and Cynthia Wills in September 1974 as nursing assistants. Both complainants are black. Although Hollingsworth and Wills received satisfactory job evaluations in the early part of 1975, they were fired on June 6, 1975, and replaced by two black women. Complainants alleged that they were fired because they are black. The Home asserts that they were fired because of poor work attitudes and abuse of patients.

Immediately after the two were discharged, Hollingsworth and Wills filed complaints with the Equal Employment Opportunity Commission (EEOC). The EEOC deferred to the District of Columbia Office of Human Rights (the Office) on June 10, 1975, and Hollingsworth and Wills filed new complaints with the Office on July 11,

1975.[2] The Office issued its probable cause finding on September 14, 1976, more than a year after the date of deferral. Commission regulations provided that the Office shall determine within 120 days of the service of the complaint whether there is probable cause to believe that the employer has engaged in unlawful discriminatory practices. 34 DCRR § 31.2 (b) (codified as enacted at D.C.Code § 1-2545(b) (1981)). Thereafter, the Office held a conciliation conference and attempted unsuccessfully to settle the matters. On November 7, 1977, approximately fourteen months after the probable cause finding, the Commission notified the Home that it was required to answer the charges against it at a public hearing. A hearing on the complaints finally commenced on December 6, 1977, almost two and a half years after the Office had received the case. After the hearing had been continued twice, the complainants concluded the presentation of their cases on February 16, 1978.[3]

When the complainants rested their cases, the Home moved that the cases be dismissed because of the length of time that had elapsed between the filing of the complaints and the hearing. The Hearing Examiner denied the motion. After the ruling, the Home raised the matter of prejudice from the delay, representing to the Hearing Examiner that two key witnesses, the Nursing Director, Ms. Philbin, and the complainants' supervisor, Ms. Larch, had left the Home's employ during the course of the proceedings and were no longer willing to make themselves available to testify on its behalf. Ms. Philbin had been present at the start of the hearings, but, for reasons not of record, had been terminated before they resumed some two months later. Ms. Larch had left the Home's employ sometime between autumn 1975 and March 1976. The Hearing Examiner allowed the parties to argue concerning whether the

---

**2.** Although the record does not reflect the date on which these complaints were served on the Home, Commission regulations required service within fifteen days of the filing of a complaint. 34 DCRR § 31.2(a) (codified as enacted at D.C. Code § 1-2545(a) (1981)).

**3.** To comply with Commission rules, the hearing must be scheduled not less than ten days nor more than thirty days after service on respondent of the notice requiring it to answer the charges in the complaint. 34 DCRR § 33.1 (codified as amended at D.C.Code § 1-2550 (1981)).

delay had prejudiced the Home, but made no finding as to prejudice, and did not reconsider his prior ruling.

The Home then moved to dismiss the case on the ground that the complainants had failed to establish a *prima facie* case of discrimination. The Hearing Examiner denied that motion also. After the Home's motions had been denied, the Home announced that it had no witnesses to present.

A Final Decision and Order was issued on January 29, 1980. The Home thereafter brought an appeal in this court. Recognizing that the Home had been entitled to receive a copy of a proposed decision and order so that it could file exceptions, the District moved that the case be remanded to the Commission. On May 6, 1980, this court granted the District's motion and remanded the case to the Commission.

Four years after the remand, or approximately *nine years* after the complaint had been filed, the Commission issued an Amended Proposed Final Decision and Order, again finding that the Home had discriminated against the complainants on the basis of race. Respondent filed exceptions, and on November 9, 1984, the Commission issued its Final Decision and Order.

The length of the delay in this case has been unreasonable, not only for the complainants, who have every right to expect that their claims will be adjudicated in a timely manner, but also for the employer, who may have been severely prejudiced by the delay. Furthermore, this is not the first time we have encountered delay of this magnitude in a case from the Commission on Human Rights In *Stevens Chevrolet, Inc. v. Commission on Human Rights*, 498 A.2d 546 (D.C.1985), a case that had been pending for nine and a half years, we commented that the case "present[ed] a sorry picture of bureaucratic bungling and administrative intransigence," and criticized the Commission for its "stubborn refusal ... to correct an obvious procedural error [thereby wasting] at least six of those years." *Id.* at 547. The Commission's delay in this case deserves the same condemnation. It is imperative that the Commission develop better procedures for handling its cases.

In *JBG Properties, Inc. v. District of Columbia Office of Human Rights*, 364 A.2d 1183 (D.C.1976), we remanded the case for further proceedings to determine the impact of the Office of Human Rights' failure to abide by its own procedural deadlines for determining whether there was probable cause to believe that the employer had engaged in an unlawful discriminatory practice. *Id.* at 1187. We further held that on remand the parties could offer additional evidence regarding the impact of the delay, and that the Office of Human Rights had the burden of showing that its delay did not substantially prejudice the employer in its defense. *Id.* at 1186, 1187; *accord, Vann v. D.C. Bd. of Funeral Directors and Embalmers*, 441 A.2d 246, 248 (D.C.1982). In *JBG Properties*, we also directed that the agency, in reaching its decision whether to terminate the proceedings against the employer, balance the interests of the public and the complainant in having employment discrimination claims investigated against the prejudice an employer suffers from the challenged delay. *JBG Properties, supra*, 364 A.2d at 1186; *cf. Stevens Chevrolet, supra*, 498 A.2d at 551 n. 7 (court will not dismiss case because of administrative delay when delay was not fault of either party—no issue of prejudice).

*JBG Properties* controls this case and authorizes the dismissal of proceedings such as these upon a showing of substantial prejudice due to delay. We have considered whether our holding in *JBG* has been superseded by the opinion of the United States Supreme Court in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), and conclude that it has not. In *Logan*, the Supreme Court reversed the holding of the Illinois Supreme Court that the failure of the Illinois Fair Employment Practices Commission to comply with a statutory 120–day limit within which to convene an employment discrimination hearing deprived the Commission of jurisdiction over the case. *Id.* at 427, 438, 102 S.Ct. at 1153,

1159. The United States Supreme Court held that the complainant had been deprived of a protected property interest in violation of the Due Process Clause in that the state's procedural limitation deprived him of a hearing on the merits of the discrimination claim, a substantive right the state had created. *Id.* at 428, 434, 102 S.Ct. at 1153, 1157. Four justices expressed the view that appellant had also been denied equal protection of the laws in that his claim, and any others that were processed too late, were not accorded the full consideration on the merits given claims of a different class, those processed within 120 days. *Id.* at 438–39, 442, 102 S.Ct. at 1159, 1161.

*Logan* did not address the issue presented here and ruled on in *JBG, viz.,* whether substantial prejudice to a respondent in a discrimination case, the result of lengthy administrative agency delay, can justify dismissal when the agency, or the reviewing court, has balanced the prejudice to respondent employer against the interests of the complainant and the public in allowing the matter to go forward, and has found that the prejudice is so substantial as to require dismissal. The guidance on this issue provided by this court's decisions suggests strongly that the *JBG* analysis remains applicable. Since *Logan* was decided, this court has had two occasions to consider assertions that cases like the one before us are subject to dismissal because of agency delay. In *Atlantic Richfield Co. v. District of Columbia Commission on Human Rights,* 515 A.2d 1095, 1102–03 (D.C.1986), we relied in part on *JBG, supra,* and reiterated its holding that agency

delay should not jeopardize an aggrieved party's right to go forward with a claim before the Commission on Human Rights "absent a showing of prejudice to the opposing party." *Id.* at 1103. We considered the issue in a slightly different context in *M.B.E., Inc. v. Minority Business Opportunity Commission,* 485 A.2d 152 (D.C. 1984). There we cited *JBG* in applying a test that balanced delay prejudice to the aggrieved party, a contractor whose minority business enterprise certification had been revoked, against the public interest in allowing the agency to act. *Id.* at 155 n. 1. In light of these holdings, and on principle, we think it plain that when the prejudice to respondent is grave and could not have been avoided by reasonable efforts on respondent's part to preserve and present its case despite the agency delay, dismissal may be justified. We hold that the Commission must weigh the factors identified in *JBG* and any other factors that bear upon the justice of dismissal,[4] and must determine whether dismissal is appropriate.

Since, in this case, the Hearing Examiner denied the Home's motion to dismiss due to administrative delay before it heard argument on the motion, it could not have weighed the competing interests involved or determined whether the complainants were in any way responsible for the delay. We order that the Commission hold a hearing to determine whether the Home has been substantially prejudiced by the Office's delay in determining whether there was probable cause to go forward and the Commission's delay in scheduling and completing the hearing.[5] If the Commission

---

**4.** Other relevant factors include, but are not limited to, any contribution to the delay by respondent, any express acquiesence by respondent in the delay, any contribution to delay by complainants, and the complexity of the matters before the Commission. In enumerating these factors, we have borrowed from holdings concerning the right to speedy trial in criminal cases. *See Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Graves v. United States,* 490 A.2d 1086 (D.C.1984) (en banc), *cert. denied,* — U.S. ——, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). We deem such holdings instructive. Even though these proceedings are not criminal in nature, they are prosecuted by public authority, and a finding that a respon-

dent has violated anti-discrimination laws carries with it a degree of public obloquy, as well as civil damages. We have also considered that in purely civil proceedings, cases are not subject to dismissal because of the slowness of the forum, but may be dismissed for failure to prosecute. *See* Super.Ct.Civ.R. 41(b).

**5.** The Home challenges the delays resulting from the Office's failure to make the probable cause determination in a timely fashion and the Commission's failure to hold its hearing within the time limits specified in 34 DCRR § 33.1. We note, however, that the Office's and Commission's dilatory overall handling of these charges appears to flout the intent of the D.C.

finds prejudice, it should weigh all relevant factors in considering dismissal. On remand, the Office of Human Rights has the burden of showing that the delay did not prejudice the Home. *See JBG Properties, supra*, 364 A.2d at 1186, 1187. We explicitly note that we expect the Commission to make detailed findings of fact regarding the impact of the delay and to discuss fully the law supporting its conclusion.

## II

█ Having discussed the problems raised by delay, we turn to a discussion of the final order itself. The Commission found, in essence, that the Home had treated similarly situated employees differently, and that this disparate treatment formed the basis of its finding of discrimination. The Commission found that there was at least one similarly situated white employee, T., who performed the same duties as the complainants and was known by the Home to be engaged in conduct deemed to be grounds for termination (patient abuse), but who was not terminated for that conduct. Based on those facts, the Commission held that the complainants established a *prima facie* case of discriminatory discharge.[6]

This court's review of the Commission's order includes deciding all relevant questions of law, D.C.Code § 1–1510(a)(1) (1981), and determining whether the Com-

mission's findings of fact are supported by substantial evidence, D.C.Code § 1–1510(a)(3)(E) (1981). *See RAP, Inc. v. D.C. Comm'n on Human Rights*, 485 A.2d 173, 177 (D.C.1984).

The legal test for whether complainants made out a *prima facie* case of discriminatory termination pursuant to the District of Columbia Human Rights Act was outlined in *Thompson v. International Association of Machinists & Aerospace Workers*, 614 F.Supp. 1002, 1012 (D.D.C.1985). In *Thompson*, Judge Joyce Green held that in a sex discrimination case:

> this burden is met by plaintiff's demonstration that she (1) belongs to a protected group, (2) was qualified for the position, (3) was terminated, and (4) that others not in the protected class were treated differently.... [The] formula [does not] require[ ] direct proof of discrimination at the first stage; plaintiff need only establish facts adequate to permit an inference of discriminatory ... motive.

*Id.* at 1011–12 (citations omitted); *see also Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) ("plaintiff carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal

---

Council in enacting regulations that these claims be resolved expeditiously.

**6.** We note that the Commission's disparate treatment analysis does not square with the test it set out for establishing a *prima facie* case of discriminatory discharge. The Commission wrote:

> A *prima facie* case of discriminatory termination *may* be established by showing the following elements:
> (1) the employee is a member of a protected class,
> (2) the employee was qualified for and satisfying the normal requirements of the job he or she was performing,
> (3) the employee was discharged, and
> (4) after the employee's discharge, the same work was assigned to persons not members of the same protected class.

(Emphasis added.) The foregoing follows the test for discriminatory discharge set in *Marks v. Prattco, Inc.*, 607 F.2d 1153, 1155 (5th Cir.1979) (per curiam). *See also Flowers v. Crouch-Walk-*

er Corp., 552 F.2d 1277, 1282 (7th Cir.1977) (using same test).

Under the very test the Commission says may establish a *prima facie* case of discriminatory discharge, we would be required to reverse the Commission's order, for the record clearly shows that the Home hired black employees to replace Hollingsworth and Wills. A *prima facie* case of discriminatory discharge, however, may also be established by evidence of dissimilar treatment of similarly situated employees. *See Thompson v. Int'l Ass'n of Machinists & Aerospace Workers*, 614 F.Supp. 1002, 1012 (D.D.C. 1985). Since the latter test actually formed the basis for the Commission's order, we will apply that test in addressing the merits of the Commission's disparate treatment analysis. *See S.E.C. v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

under the Act.' ") (quoting *Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)).

The Commission correctly applied the law to the facts in this case, as it found them, in deciding that the complainants had made out a *prima facie* case of discriminatory termination. The Commission found that the complainants were members of a protected class, were qualified for their jobs, and were terminated involuntarily, while a similarly situated white employee was retained after engaging in the same type of conduct that was the proffered reason for complainants' termination. Based on these facts, the Commission found that complainants had established the facts necessary to support an inference of discrimination.

In deciding whether the Commission's findings of fact are supported by substantial evidence in the record as a whole, D.C. Code § 1-1510(a)(3)(E) (1981), this court has held that substantial evidence means more than a scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Greater Wash. Business Center v. D.C. Comm'n on Human Rights,* 454 A.2d 1333, 1338 (D.C.1982).

 One of the factual findings on which the Commission's *prima facie* case determination was based appears to be flawed. We have reviewed the record in its entirety to determine whether there is substantial evidence supporting the Commission's Finding of Fact No. 20 that there was "unrebutted testimony of the complainants that they have observed the white Nursing Assistant on their shift, T[ ], abusing patients by slapping them and calling them names." We find the support for such a finding insufficient.

The Commission's finding seems to be based on interviews that Hollingsworth and Wills had given to a trainee investigator for the Office of Human Rights. The investigator reported that the complainants said that they both had seen, "with their own eyes," T. slap patients and call them names. Since the Commission's finding tracks the language of the investigator's report, we think it apparent that the Commission relied on this statement as the basis for Finding of Fact No. 20.

The Commission was not required to disregard the evidence concerning what Hollingsworth and Wills told the investigator merely because such evidence was hearsay. *Mont. Power Co. v. Fed. Power Comm'n,* 87 U.S.App. D.C. 316, 323, 185 F.2d 491, 498 (1950) (factfinder in administrative adjudication may consider relevant and probative hearsay), *cert. denied,* 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683 (1951); D.C.Code § 1-1509(b) (1981). In fact, hearsay evidence can serve under some circumstances as "substantial evidence" on which to base a finding of fact. *Simmons v. Police & Firefighters' Retirement Bd.,* 478 A.2d 1093, 1095 (D.C.1984) (per curiam) ("If hearsay evidence is found to be reliable and credible, it may constitute substantial evidence."); *Hoska v. United States Dep't of the Army,* 219 U.S.App.D.C. 280, 287, 677 F.2d 131, 138 (1982); *Johnson v. United States,* 202 U.S.App.D.C. 187, 190, 628 F.2d 187, 190 (1980); *see Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 1428, 28 L.Ed.2d 842 (1971). The weight to be accorded hearsay evidence is determined by the item's "truthfulness, reasonableness, and credibility." *Johnson, supra,* 202 U.S. App.D.C. at 190-91, 628 F.2d at 190-91. Among the factors to consider in evaluating the reliability of hearsay evidence are whether the declarant is biased, whether the testimony is corroborated, whether the hearsay statement is contradicted by direct testimony, whether the declarant is available to testify and be cross-examined, and whether the hearsay statements were signed or sworn. *Calhoun v. Bailar,* 626 F.2d 145, 149 (9th Cir.1980), *cert. denied,* 452 U.S. 906, 101 S.Ct. 3033, 69 L.Ed.2d 407 (1981).

On the facts of this case, we hold that the investigator's testimony was not reliable enough to serve as substantial evidence supporting Finding of Fact No. 20. Our conclusion is based primarily on the fact that neither Hollingsworth's nor Wills' testimony at the hearing was consistent with the statements attributed to them in

the investigator's report. Hollingsworth testified that she had seen T. grab and bruise a patient. Although Hollingsworth was never asked directly whether she witnessed any slapping or verbal abuse of patients, she was asked several times to recount what she saw T. do to patients and never mentioned slapping or verbal abuse. Wills testified that she had no personal knowledge of any patient abuse by T., and had only heard about what T. may have done from Hollingsworth. Thus, neither complainant testified about any slapping incidents or verbal abuse, nor did Wills testify that she had observed any incidents of patient abuse by T.

Furthermore, the statements that complainants made to the investigator were neither given under oath nor signed. When the investigator testified at the Commission hearing, she was impeached with a statement in her report that contradicted her sworn testimony. Considering all relevant parts of the record, we conclude that there is no substantial evidence supporting the finding that a white nursing assistant slapped patients and called them names. *See McKee v. United States,* 500 F.2d 525, 528, 205 Ct.Cl. 303 (1974) (per curiam) ("In an administrative hearing, 'rank hearsay' not only is admissible, ... but can constitute substantial evidence if sufficiently convincing to a reasonable mind.... However, mere hearsay lacking sufficient assurance of its truthfulness is not substantial evidence to overcome the sworn testimony of a claimant." (citations omitted); *cf. Simmons, supra,* 478 A.2d at 1095 (sworn hearsay statements by disinterested witnesses accompanied by supporting documentation found sufficiently probative and reliable to support findings and conclusions).

■ Although the Commission premised Finding No. 20 on insubstantial evidence, it could have made a virtually identical finding based on substantial evidence of record. There was testimony at the hearing sufficient to support a finding that T. treated patients roughly and bruised them. Hollingsworth consistently testified that she had observed T. mistreat a patient. There-

fore, although Finding of Fact No. 20 inappropriately relied on the hearsay statements of complainants in the investigator's report rather than on their sworn testimony at the hearing, because the Commission could have credited other evidence that T. had engaged in patient abuse at the Home, we are satisfied that this error was not prejudicial.

The test for determining whether such error in an administrative proceeding is prejudicial was set out by this court in *Arthur v. District of Columbia Nurses' Examining Board,* 459 A.2d 141, 146 (D.C. 1983), in which we held that "reversal and remand is required only if substantial doubt exists whether the agency would have made the same ultimate finding with the error removed." *Accord, Liberty v. Police & Firemen's Retirement and Relief Bd.,* 410 A.2d 191, 194 (D.C.1979); *see also Greater Boston Television Corp. v. F.C.C.,* 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970) (court will not upset an agency decision because of errors that are not material), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). We are satisfied that the Commission's error was not prejudicial here because Hollingsworth presented unrebutted testimony that she observed T. abuse a patient and that she overheard a conversation in which T. was criticized by a superior for her reported rough handling of a patient. We conclude that there is no substantial doubt that, if we were to remand, the Commission would credit such unrebutted testimony to conclude that T. had engaged in the same conduct, *i.e.,* patient abuse, for which Hollingsworth and Wills were terminated.

The Commission's other factual findings underpinning its conclusion that a *prima facie* case of discrimination had been proven are well supported by the record. It was undisputed that complainants are black and were involuntarily terminated from their jobs at the Home. The Commission's finding that Hollingsworth and Wills were qualified, reasonably competent nursing assistants was supported by the Home's written evaluations of their job performance in the spring of 1975. Complainants' testimony supported the Commis-

sion's findings that the Home had received at least one complaint that T. had abused a patient and that the Home did not fire T. after learning of this incident. Therefore, the Commission's conclusion that complainants had made out a *prima facie* case of disparate treatment is supported by substantial evidence.

The Commission thereafter found that the explanation for firing complainants offered by the respondent was "not supported by evidence legally sufficient to rebut the *prima facie* inference of discrimination." The Commission further found that even if the Home introduced evidence sufficient to raise a genuine issue of fact as to whether it had a legitimate nondiscriminatory reason for terminating Hollingsworth and Wills, the complainants also met their burden of persuading the Commission that the Home's proffered explanation for terminating them was a pretext for a decision more likely motivated by discrimination.

■ The Commission accurately set forth the order and burdens of proof in a Title VII case alleging discriminatory treatment as the Supreme Court prescribed them in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).[7] When applying those burdens to respondent's attempt to demonstrate a legitimate, nondiscriminatory reason for its discharge of the complainants, the Commission mistakenly required respondent to meet a burden of persuasion rather than the burden of production required by *Burdine*. The Commission's misallocation of burden led it to conclude erroneously that the Home failed to carry its burden of articulating a legitimate, nondiscriminatory reason for its discharge of the complainants. Several documents completed by the Home in response to Office of Human Rights' questionnaires indicated that Hollingsworth and Wills were terminated because of their poor attitudes, complaints

received concerning their abuse of patients, and their refusal to identify others whom they had observed abusing patients. These documents, although hearsay,[8] were sufficient to raise a factual issue as to why complainants were discharged.

The Commission's erroneous imposition on respondent of too great a burden regarding the articulation of a legitimate, nondiscriminatory reason does not, however, require reversal. The Commission weighed the Home's nondiscriminatory reason for its discharge of complainants, and found that the explanation was a pretext for discrimination. That finding has sufficient support in the record. The Commission's finding of pretext was supported by the inconsistencies in the Home's documentation of its purported reasons for terminating Hollingsworth and Wills, by complainants' testimony that they were given no reasons for their respective discharges at the time they occurred, and, as previously discussed, by evidence that a white employee, similarly situated, was not terminated. Thus, we conclude that on the record as a whole the Commission's finding of discrimination has sufficient support in the facts and the law.

In summary, the Commission's findings contained only one flaw that gives us pause, *i.e.*, its unsupported finding that complainants observed T. verbally abuse and slap patients. Because the Commission considered unrebutted testimony that demonstrated that T. physically abused at least one patient and the Commission's other findings and conclusions underlying its ultimate finding of disparate treatment are substantially supported by evidence of record, we conclude that this flaw in the Commission's findings is harmless error.

III

We turn now to the matter of damages. Appellant challenges the Commission's back pay awards to complainants on two grounds. First, the Home contends that

---

7. This court has previously held that the Title VII analysis applies to discrimination cases brought under the District of Columbia Human Rights Act. *RAP, Inc., supra,* 485 A.2d at 176.

8. See discussion, *supra* at 288–89, concerning the admissibility of hearsay in Commission hearings.

Wills did not exercise reasonable diligence in seeking alternative employment. Second, the Home argues that its back pay liability to both complainants ended when they found jobs with the Washington Home for Incurables, even though they were later involuntarily terminated from those jobs.

Addressing the Home's first contention, we observe that ordinarily a victim of discriminatory discharge is entitled to receive back pay, *i.e.*, the salary that she would have received from the employer but for the unlawful discriminatory acts. *See* District of Columbia Commission on Human Rights, "Guidelines for Payment of Compensatory Damages," 21 D.C.Reg. 1603, 1606 (1975). A back pay award should equal the salary the complainant would have received from the time of the violation until the date on which the Commission issued its final order, minus the complainant's actual interim earnings or the amounts she would have earned had she diligently sought other work.[9] *See id.* at 1605–06; *cf. Clark v. Marsh*, 214 U.S. App.D.C. 350, 353–54, 665 F.2d 1168, 1171–72 (1981) (interpreting Title VII). It is the complainant's burden to present evidence demonstrating the amount of her damages, but once such evidence has been presented, the burden shifts to the defendant to establish the amount by which those damages should be reduced to reflect the complainant's interim earnings or to show her failure to take reasonable efforts to mitigate her damages by finding alternative employment. *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 623 (6th Cir.1983), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984); *see Horn v. Duke Homes, Div. of Windsor Homes*, 755 F.2d 599, 606, 608 (7th Cir.1985). The finding that a claimant exercised reasonable dil-igence in seeking alternative employment following a discriminatory discharge is an issue of fact subject to our determination, upon review, of whether it was supported by substantial evidence. D.C.Code § 1–1510(a)(3)(E) (1981).

After a review of the record, we conclude that the evidence Wills presented was sufficient to establish the damages she suffered from her unlawful discharge; however, we hold the Commission's finding that Wills was reasonably diligent in seeking alternative employment unsupported by substantial evidence of record. Wills presented evidence establishing, *inter alia*, her salary at the Home at the time of her discharge, the period for which she was unemployed following that discharge, and the date on which she began her current job and its salary. Since an estimate of the damages could be calculated from these figures, and since it is the Home's burden to show the amount of Wills' interim earnings, Wills met her initial burden of demonstrating her damages.

The evidence showed that shortly after her termination from the Home, Wills worked for the Washington Home for Incurables (WHI) for approximately one month. Thereafter, she was terminated when WHI reduced its staff. Wills then applied for and received unemployment compensation for approximately twenty-two weeks. With the exception of a month of private duty nursing that she did for a friend, Wills remained unemployed until January 28, 1977, when she began to work full-time at WHI. In the time that she was unemployed, approximately one and a half years, Wills interviewed for only two nursing assistant positions, *viz.*, at the Southeast Community Home and at the Washington Nursing Home, Wills did not seek em-

---

**9.** Some courts have included anticipated raises in salary in their back pay calculations. *See, e.g., Sinclair v. Auto. Club of Okla., Inc.*, 733 F.2d 726, 729 (10th Cir.1984) (salary differential plus raises and bonuses); *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 626 (6th Cir.1983) (includes salary plus raises and all benefits), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984). Since neither complainant objected to the Commission's use of her actual salary at the time of her discharge in its back pay calculation, that issue is not presented in this case. Neither Hollingsworth nor Wills challenged the Commission's subtraction of the amount of unemployment compensation they received from their back pay awards either. That issue also, therefore, is not before us, and we express no opinion as to whether such a reduction was appropriate.

ployment in any capacity other than as a nursing assistant.[10]

Although it was the Home's burden to show that Wills did not seek alternative employment with reasonable diligence, it could satisfy that burden through the testimony of Wills herself. We are constrained to conclude that the Commission's finding that Wills diligently sought other work is unsupported by the record before us. *See Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 866 & n. 2, 868 (9th Cir.1980) (flight attendant's minimal efforts to seek employment over a period of eight years not reasonably diligent), *cert. denied*, 451 U.S. 971, 101 S.Ct. 2048, 68 L.Ed.2d 350 (1981). We therefore remand to the Commission for a determination of the wages that Wills could have earned had she diligently sought alternative employment. *See Horn v. Duke Homes, supra,* 755 F.2d at 608; *see also Brady v. Thurston Motor Lines,* 753 F.2d 1269, 1280 (4th Cir.1985) (reduced back pay award by the amount complainant could have earned by reasonably diligent effort); *Rimedio v. Revlon, Inc.,* 528 F.Supp. 1380, 1390–91 (S.D.Ohio 1982) (same); *Grindstaff v. Burger King, Inc.,* 494 F.Supp. 622, 625 (E.D.Tenn.1980) (same); *Helbling v. Unclaimed Salvage & Freight Co.,* 489 F.Supp. 956, 964 (E.D.Pa. 1980) (same); *cf. Sangster v. United Airlines, supra,* 633 F.2d at 868 (denial of any back pay appropriate when claimant failed to mitigate damages).

The Home's second contention is that its back pay liability ended when, in the summer of 1975, Hollingsworth and Wills obtained short-lived jobs as nursing assistants with WHI. We find this contention unpersuasive.

Shortly after Hollingsworth and Wills were terminated by the Home in June 1975, they obtained employment with WHI, but were laid off several weeks later when WHI reduced its staff.[11] Had Hollings-

worth and Wills voluntarily quit their jobs at WHI, the Home's back pay liability would have terminated. *See Brady, supra,* 753 F.2d at 1273, 1277; *Di Salvo v. Chamber of Commerce,* 568 F.2d 593, 597–98 (8th Cir.1978); *NLRB v. Miami Coca-Cola Bottling Co.,* 360 F.2d 569, 575 (5th Cir.1966). The rationale for this rule is that, in the absence of extenuating circumstances such as unreasonable working conditions, a voluntary termination of employment represents a choice to incur a loss of earnings in violation of the employee's duty to make reasonable efforts to mitigate damages. *Brady, supra,* 753 F.2d at 1278. Such a rationale would obviously not apply where, as here, the complainant was terminated from her substitute employment through no fault of her own. Therefore, we reject the Home's argument that we limit its back pay liability to the date complainants began working at WHI. *See Galindo v. Stoody Co.,* 793 F.2d 1502, 1517 (9th Cir.1986) (interim employment reduces but does not cut off back pay liability); *see also Nord v. United States Steel Corp.,* 758 F.2d 1462, 1471–72 (11th Cir.1985) (wages from short-term employment deducted from back pay); *Horn, supra,* 755 F.2d at 607 (twelve weeks of interim employment deducted from back pay). We recognize that there is a point at which employment is of such duration that it cannot be considered short-lived or interim in nature. We are satisfied, however, that wherever the line eventually may be drawn, the complainants' employment of one month or less at WHI is short of the duration of subsequent employment that suffices to breach the causal chain that links wrongful termination with later joblessness.

After Hollingsworth was terminated from WHI, she collected unemployment

---

**10.** It appears indisputable that entry-level jobs are generally available in this area. If at any time the Commission has reason to doubt the validity of this assumption, it can direct an employer to establish the availability of such employment. *Cf. EEOC v. Sandia Corp., supra,* 639 F.2d at 627 (lack of reasonable diligence not

shown when defendant did not show the existence of technical and supervisory positions comparable to those of claimants).

**11.** Hollingsworth and Wills were employed at WHI for approximately three weeks and one month, respectively.

compensation for one month until, in August 1975, she became a full-time permanent employee at the Hecht Company at a salary greater than she received at the Home. Based on these facts and its determination that Hollingsworth diligently sought alternative employment, the Commission ordered the Home to "pay Hollingsworth such backpay as is commensurate with [her salary at the Home] less all income from alternate employment and unemployment compensation for income lost from June 7, 1975, to August 25, 1975, as a result of respondent's unlawful discrimination." We find the Commission's back pay award to Hollingsworth supported by the record and in accordance with the law, and therefore affirm it, subject to our holding above concerning prejudicial delay.

On remand, the Commission shall hold a hearing to determine (1) whether the delay from June 1975, when the case was deferred to the Office by the EEOC, to February 1978, when the Commission finished its presentation of its case, so prejudiced the Home that dismissal of the complaints is warranted, given the factors appropriate to that decision discussed above, and (2) the amount of interim earnings Wills would have received had she diligently sought alternative employment after she was fired by the Home. Whether evidence must be taken with respect to either issue, we leave to the considered discretion of the Commission. Regardless of the extent to which the Commission finds it necessary to reopen the record to address these issues, in light of the delay thus far, we order that any and all hearings on the proceedings in this case commence within thirty days from the date of the issuance of our mandate and be conducted with expedition.[12] We further order that the Hearing Examiner [or Commissioner] report his or her proposed findings to the Commission within thirty days after completion of the testimony. The Commission shall issue its final decision within forty-five days after receiving the Hearing Examiner's report.

12. Pursuant to D.C.App.R. 41(a), the mandate issues 21 days after the entry of this court's

*Remanded for further proceedings consistent with this opinion.*

judgment, unless the time is shortened or extended by order.